**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

JANE DORNICK,

                Petitioner,

                v.

UNITED STATES OF AMERICA,

                Respondent.

Civil Action No. 18-5090 (ZNQ)

**OPINION**

**QURAISHI, District Judge**

        This matter comes before the Court on Petitioner's motion to vacate her sentence[1] brought

pursuant to 28 U.S.C. § 2255.  (ECF No. 1.)  Petitioner filed briefs in support of her motion (ECF

No. 12, 20), to which the Government responded.  (ECF No. 32.)  The parties also filed

supplemental briefs in response to an order issued by the Honorable Freda L. Wolfson.  (ECF Nos.

37-40.)  This Court held an evidentiary hearing as to the motion on May 12, 2026.  (ECF No. 91.)

---

[1] This matter was initially filed in April 2018 and assigned to the trial judge, Judge Wolfson.  (ECF No. 1.)  The court's consideration of the motion was initially delayed by a request by counsel for permission to submit more briefing (*See* ECF Docket Sheet), as well as by a motion for compassionate release filed in October 2020 while briefing was underway.  (ECF No. 25.)  Judge Wolfson thereafter issued an order for supplemental briefing, which was completed in late 2021. (*See* ECF Nos. 33, 37, 38-40.)  Upon Judge Wolfson's retirement, this matter was reassigned to another district judge, (*see* ECF No. 42), who oversaw the case until it was reassigned to the undersigned in September 2023.  (ECF No. 48.)  During the pendency of this matter before this Court, Petitioner raised several ancillary issues which required further attention before the merits of this matter could be addressed.  (*See* ECF Nos. 49-58.)  Once these issues were addressed, this Court determined that an evidentiary hearing was necessary in this matter, and proceeded with that hearing as soon as was practicable in light of the needs of the parties.  (*See* ECF Nos. 59-91.)

For the following reasons, Petitioner's motion to vacate sentence (ECF No. 1) shall be denied, and Petitioner shall be denied a certificate of appealability.

Also before the Court are three outstanding motions to seal Petitioner's various submissions. (ECF No. 68, 77-78.) The Court having considered those motions, the Government having not opposed those motions, and given the sensitive nature of the facts of this matter and Petitioner's interests in the privacy of medical records, those motions shall be granted.

## I.      **BACKGROUND**

In the opinion affirming Petitioner's conviction and sentence, The Court of Appeals for the Third Circuit summarized the factual background of this matter as follows:

> Federal prosecutors charged [Petitioner] with various crimes arising from her production of sexually explicit photographs and videos involving her underage daughter. [Petitioner] pleaded guilty to one count of violating 18 U.S.C. § 2251(a), and the District Court sentenced her to 360 months' imprisonment.
>
> . . . .
>
> [Petitioner] previously worked as a newspaper reporter for the *South Plainfield Observer*, a local newspaper in New Jersey, and formed a relationship with Michael Grennier, a South Plainfield police captain, to obtain stories and crime reports. In 2009, [Petitioner] sent Grennier explicit photos of her twelve-year-old daughter in exchange for money. She claims Grennier[, who had retired from the police force,] told her he was working on a sting operation in the mode of the television show *To Catch a Predator* and that he needed explicit photos to attract would-be child molesters.
>
> At first, [Petitioner] received about $40 for each explicit photo. Then, as [Petitioner]'s daughter grew older, Grennier began requesting explicit videos and live webcam sessions of her, soliciting and paying [Petitioner]'s daughter directly. Grennier also paid [Petitioner]'s daughter directly in exchange for sexual acts. [Petitioner] admitted to knowing about Grennier's "price list" for certain sexual favors. In addition, [Petitioner] recruited her minor son to provide explicit photos and videos to Grennier. On at least

> three occasions, [Petitioner]'s daughter invited her friend, who was 15 years old at the time, to record sexual acts either involving Grennier or at his direction.
>
> There is also extensive evidence of [Petitioner]'s participation in the production of child pornography.  The FBI eventually recovered approximately 900 still images and 19 videos of various minor children involved in Grennier's conduct, including 854 still images and several videos of [Petitioner]'s daughter.  On May 1, 2014, a grand jury returned an indictment charging [Petitioner] with three counts of sexual exploitation of a child in violation of 18 U.S.C. § 2251(a).  [Petitioner] ultimately pleaded guilty to one count.  At sentencing, the District Court calculated a total offense level of 49, which corresponds to a Guidelines sentence of life in prison. . . However, because [Petitioner]'s crime of conviction contains a statutory maximum sentence, 18 U.S.C. § 2251(e), the District Court sentenced [Petitioner] to 360 months' imprisonment and a life term of supervised release.

(ECF No. 6 at 148-49.)

On May 12, 2026, this Court held an evidentiary hearing as to Petitioner's claims that plea counsel's failure to seek an expert opinion as to diminished capacity had an injurious effect on her plea and ultimate sentence.  During this hearing, Petitioner called only two witnesses: Dr. Jeffrey Singer, a proposed psychological expert, and Bruce Throckmorton, Petitioner's plea counsel.  (Hearing Tr. at 2.)  During his testimony, Dr. Singer testified that he is a licensed psychologist with an expertise in clinical and forensic psychology with a specialization in dealing with the risk assessment of sex offenders.  (*Id.* at 8-10.)

In describing the process he used to evaluate Petitioner, Dr. Singer testified that although he based his opinion on interviews with Petitioner and some of her past treatment records, that he did not review any of the abuse material underlying Petitioner's crimes because he believed  that it was unnecessary.  More specifically, he felt that Petitioner's case wasn't chiefly one involving someone "who made [such material] as part of their modus operandi" but instead someone who had been manipulated into doing so.  (*Id.* at 11-12.)  Although he recognized that she legally was

3

a sex offender, Dr. Singer stated that he did not believe that Petitioner truly was a sex offender, and in at least one flippant comment questioned whether her children were actually victims despite being the subjects of the abuse material Petitioner created.[2] (*Id.* at 12, 23.)  Dr. Singer also stated that although he had worked on a number of cases, Petitioner's was the only case on which he had worked involving a mother who made child sexual abuse material of her own children.  (*Id.* at 19.)

Turning to Petitioner's mental state, Dr. Singer stated that Petitioner suffered from panic disorder at times accompanied by agoraphobia, and that this disorder accompanied by her history of alleged abuse by her parents made her the "perfect mark" for manipulation by a figure such as Grennier.  (*Id.* at 21-26.)  Dr. Singer, without providing a strong basis for the opinion, further stated that he believed Petitioner had never established "her own sense of autonomy, of agency, of feeling that she's good enough to set appropriate boundaries."  (*Id.* at 26.)  He therefore viewed Petitioner as essentially an eternal victim who had spent her life being manipulated or abused by essentially every male figure in her life – including her father, brother, ex-husband, and Grennier. (*Id.* at 21-26.)  Dr. Singer opined that based on this view, he believed that Petitioner suffered from "diminished capacity" without clarifying when she allegedly was subject to this state, or for how long.  (*Id.* at 26-27.)

During cross-examination, Dr. Singer admitted that he had not read Petitioner's statute of conviction, that he did not know what the required criminal intent for that statute was, and that he did not have a clear idea of the dates on which Petitioner had actually committed the underlying offenses.  (*Id.* at 29-30.)  Dr. Singer also admitted on cross that his opinion of Petitioner was largely

---

[2] Although Dr. Singer would later withdraw this comment about the children, he only did so after being pressed by the Court. Nonetheless, it further demonstrated that Dr. Singer's opinion was not tethered to the facts and evidence presented in the case.  (*Id.* at 23.)

developed from reviewing Petitioner's self-reports and filings, many of which cast the charges against her and the Government's opposition as "lies" or otherwise misleading. (*Id.* at 35-37.)

When challenged on the basis for his opinion, Dr. Singer repeatedly asserted, without clearly defining or clarifying his terms, that Petitioner had "diminished capacity." (*Id.* at 39, 45-47.) When pressed, Dr. Singer defined this term as having a mental disorder "that impairs their ability to exercise legal behavior and be aware of what they're doing in terms of breaking the law." (*Id.* at 47.) Dr. Singer also defined the term, however, as "having a mental defect that would predispose a person to commit a crime [more] than a person without that mental defect." (*Id.*)

Although Dr. Singer referred to diminished capacity as his diagnosis, he admitted that the term is a legal concept rather than a diagnosis, that he had not studied the law or legal definitions of the terms in depth, and that he had changed his definition of the term in his reports and testimony. Nonetheless, Dr. Singer insisted that his conclusion would be the same regardless of the definition used. (*Id.* at 50-53.) He also suggested that he changed the definition to more closely match the sentencing guidelines in his second report after a "google search" for the term. (*Id.* at 53, 56-60, 72-76.) Despite his repeated assertion that Petitioner suffered diminished capacity, Dr. Singer admitted he could not nail down any specific time frame, and that Petitioner was in any event still aware of what she was doing when she recorded pornographic images and videos of her then minor children. (*Id.* at 65-67.)

During his testimony, Mr. Throckmorton had some difficulty remembering the specifics of his representation of Petitioner, which is understandable in light of the more than a decade which passed between that representation and the hearing in this matter. (*Id.* at 83-90.) Throckmorton testified that, based on the significant evidence against Petitioner and her statements to the authorities, he believed Petitioner's criminal case would not fair well at trial and that seeking a plea was the best solution for her case. In this regard, he actively worked towards a plea deal

although he acknowledged her would have preferred to negotiate a more beneficial plea than the one offered by the Government. (*Id.* at 105-06, 108-09.) As part of this process, he discussed with Petitioner her sentencing exposure – which he described as "very serious" should she proceed to trial and lose. (*Id.* at 109.) He also reviewed the sentencing guidelines with Petitioner as they related to her charges and a potential plea. (*Id.*) Despite Petitioner ultimately following that advice and pleading guilty, Throckmorton testified that she replaced him as counsel not long after the plea as she was dissatisfied with him. (*Id.* at 114.)

Turning to the issue of diminished capacity, Throckmorton testified that he had considered the relevance of Petitioner's mental state, but thought that there was no clear basis to seek a "not guilty by reason of mental defect" at trial. (*Id.* at 115.) He did, however, seek to have a forensic psychologist, Ronald J. Coughlin, evaluate Petitioner anyway. (*Id.* at 116-20.) Throckmorton described Petitioner as nervous and intelligent, but believed consulting with a psychological expert was warranted as he "though there might be something in her background" or mental state that might account for her actions which gave rise to the charges. And additionally, Throckmorton thought that any explanation could potentially be useful at sentencing. (*Id.* at 133.) The bottom line is that Throckmorton struggled, like any reasonable person, to reconcile how any mother could commit the egregious acts Petitioner did against her own children. And he admitted that "the facts of this case were so upsetting, so extreme, so unusual that [he] felt that there had to be something up with [Petitioner], that maybe a psychologist could ferret . . . out . . . that would be useful." (*Id.* at 134.)

Throckmorton, in abundance of caution, even though Petitioner has not displayed any signals warranting him to do so – decided to seek an expert, and Coughlin was recommended to him by the Federal Public Defender's office. (*Id.* at 137-38.) Although Coughlin never did a full evaluation of Petitioner, Coughlin specifically told Throckmorton after reviewing her statements

to police and various other portions of the record that Petitioner was lying in her assertions that she had been manipulated into her misdeeds. (*Id.* at 140-41.) Records of an *ex parte* conference held during the plea proceedings support this assertion, as at that time Throckmorton reported to the plea judge that his expert had "reviewed the evidence and . . . said 'I can't help you with the diminished capacity[, t]here is no diminished capacity." (*Id.* at 143-44.) Having reviewed the expert's opinion of Petitioner and considering the 90 years she faced if convicted at trial, Throckmorton testified that he believed that Petitioner's only chance was to plead guilty, and that by doing so she had reduced her exposure from 90 years to a maximum of a 30-year sentence, which was essentially the best available option. (*Id.* at 144.) In Throckmorton's opinion, proceeding to trial would have been a fool's errand as the video evidence was "devastating" and almost certainly would have resulted in a harsher sentence. (*Id.* at 144-45.)

## II.     LEGAL STANDARD

A prisoner in federal custody may file a motion pursuant to 28 U.S.C. § 2255 challenging the validity of his or her sentence. Section 2255 provides, in relevant part, as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255. Unless the moving party claims a jurisdictional defect or a constitutional violation, to be entitled to relief the moving party must show that an error of law or fact constitutes "a fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair procedure." *United States v. Horsley*,

599 F.2d 1265, 1268 (3d Cir. 1979) (quoting *Hill v. United States,* 368 U.S. 424, 429 (1962)), *cert. denied* 444 U.S. 865 (1979); *see also Morelli v. United States*, 285 F. Supp. 2d 454, 458-59 (D.N.J. 2003).

III.   **DISCUSSION**

A. **Credibility Determinations**

This Court having conducted an evidentiary hearing in this matter, and having heard the testimony of both Dr. Singer, Petitioner's proposed psychological expert, and Throckmorton, her plea counsel, the Court having observed the demeanor of these witnesses and having evaluated their testimony, the Court makes the following credibility findings. The Court finds the testimony of Dr. Singer not credible and in any event to be unhelpful. This assessment is based upon his demeanor, manner of testimony, and the lack of consistency between his testimony and the substantial evidence against Petitioner in the record. Dr. Singer, in both his testimony and reports in this matter, used multiple conflicting definitions of what he meant in saying that he believed that Petitioner suffered from diminished capacity in her criminal behavior. Dr. Singer failed on the stand to consistently or clearly define just what he meant by diminished capacity, and instead referred to this legal terminology as his "diagnosis" of Petitioner, repeating the phrase throughout his testimony in an effort to attach greater meaning to it.

Dr. Singer did not provide an in-depth evaluation of Petitioner's ability to form any of the requisite mental states, and instead sought to place the blame for all of Petitioner's misdeeds on any and all of the men in her life – from her father, to her brother, to her ex-husband, and ultimately Grennier. Dr. Singer declined to clarify during what time frames or what periods Petitioner suffered from this alleged incapacity, instead painting her in broad terms as a person apparently devoid of agency whenever a strong male figure was present in her life. Dr. Singer's testimony

8

thus presented itself as an extension of Petitioner's own attempts to minimize her own illegal conduct and to place blame on others, rather than useful psychological information.

The Court further notes that Dr. Singer testified several times during the hearing that viewing the video and photographic evidence in this matter would not be necessary or helpful in reaching his opinions as to Petitioner's mental states, despite specifically requesting an eleventh hour opportunity to review that material prior to the hearing and admitting that aspects of the videos could be relevant to the ultimate question on which he was asked to opine – Petitioner's mental state and capacity to form the requisite intent to support her convictions.  Dr. Singer did not adequately explain the discrepancy between these two positions – that the videos were not necessary but could be relevant, and that viewing them was both unimportant to his task and yet was a necessary step in preparing for the hearing at which he testified.[3]  These discrepancies also further highlight the considerable distance between Dr. Singer's testimony and facts in the record of this matter.  As Dr. Singer does not appear to have truly made a considerable effort to grapple with the full facts of Petitioner's case and background and instead appears to have based his opinions on cherry-picked, largely self reported sources of data, his opinion testimony in this matter appeared to be results-oriented.

The Court having considered Dr. Singer's demeanor, manner of speaking, and the discrepancies in his testimony, the Court finds Dr. Singer's testimony not credible, and assigns little weight to it.  As the Court finds his proposed expert testimony was of little value, his testimony would almost certainly have been rejected by a trier of fact had it been presented at trial or sentencing, especially in light of the overwhelming evidence of Petitioner's guilt.

---

[3] The Court previously touched on this issue when denying Dr. Singer's last-minute request to review the actual evidence because it was in response to a weakness in his opinion that the Government alleged would be exposed on cross examination (which it was).  (*See* ECF No. 88.)

Turning to the testimony of plea counsel, this Court found Throckmorton's testimony to be generally credible. As one would expect given the many years that passed since his representation of Petitioner concluded over a decade ago, Throckmorton had only a limited memory of the specifics of his representation of Petitioner, but what clear memories he had were reasonable, credible, and squarely supported by the documentary record of this matter, including CJA records and statements he made to the trial judge during an *ex parte* conference held during his representation. Having considered Throckmorton's demeanor, the manner of his testimony, and the substance of his testimony in light of the corroborating evidence in the record, the Court credits Mr. Throckmorton's testimony and assigns it substantial weight.

As Petitioner chose not to testify at the evidentiary hearing held in this matter despite having the opportunity to do so, this Court makes no assessment of her credibility. The Court does note, however, that in declining to testify, Petitioner failed to provide any direct evidence that she would have chosen a different course had plea counsel advised her in a manner other than he did during the course of his representation. This deficiency in Petitioner's presentation was fatal to her claim regardless of any credibility failings on the part of her expert witness.

## B.  Petitioner's ineffective assistance of counsel claims

In her motion to vacate sentence, Petitioner raises a number of claims in which she asserts that here plea counsel was constitutionally deficient. The standard applicable to such claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also*

10

*United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.

In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

11

In the context of a guilty plea, a petitioner seeking to show prejudice must "show that there is a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial." *United States v. Bui*, 795 F.3d 363, 367 (3d Cir. 2015) (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)). As the Third Circuit has explained,

> [w]hen addressing a guilty plea, counsel is required to give a defendant enough information "'to make a reasonably informed decision whether to accept a plea offer.'" *Shotts v. Wetzel*, 724 F.3d 364, 376 (3d Cir. 2013) (quoting *United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992), *cert. denied*, [571 U.S. 1224] (2014). We have identified potential sentencing exposure as an important factor in the decisionnmaking process, stating that "[k]knowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty." *Day*, 969 F.2d at 43. In order to provide the necessary advice, counsel is required "to know the Guidelines and relevant Circuit precedent . . . ." *United States v. Smack*, 347 F.3d 533, 538 (3d Cir. 2003). However, "an erroneous sentencing prediction by counsel is not ineffective assistance of counsel where . . . an adequate plea hearing was conducted." *United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007).

*Bui*, 795 F.3d at 367.

In her chief claim,[4] Petitioner contends that her plea counsel, Throckmorton, proved ineffective in failing to retain an expert as to her diminished capacity and alleged inability to form the necessary mental state to support her conviction. Petitioner argues that she was taken advantage of by Grennier and that, as a result of her alleged suggestibility in the face of strong male figures, acquiesced to his requests in the belief that she was aiding him in creating a sting operation for child predators. Petitioner argues that this both prejudiced her by preventing her from preparing a viable trial defense which would have obviated the need for her guilty plea, and

---

[4] This claim is presented in both grounds one and nine of Petitioner's motion to vacate sentence, and undergirds many of her other claims.

12

hampered her ability to pursue diminished capacity as a potential basis for a sentencing variance or downward departure.

Initially, the Court notes that Petitioner's claims, both as to the plea and sentencing, are based on the misguided assumption that plea counsel failed to consider and pursue this avenue before advising Petitioner to plead guilty. As counsel testified at the evidentiary hearing, and the record of this matter indicates, however, plea counsel did believe that procuring a psychiatric expert could provide an explanation for Petitioner's behavior and possibly a basis for a defense. Counsel for that reason did hire an expert – Couglin -  and had him review the evidence in Petitioner's case, only for that expert to tell counsel that he believed that Petitioner was a liar and that there was no basis for a finding of diminished capacity or an inability to form the requisite *mens rea* for Petitioner's criminal offenses. It was only after this proposed expert informed counsel that there was no basis for such a defense that counsel abandoned efforts to find a psychiatric expert on her behalf. This background clearly indicates that counsel did, in fact, pursue an investigation into Petitioner's mental state and its relevance to her criminal defense, and only ceased to do so after he was given advice by a psychiatric expert that that pursuit would not bear fruit. It is unclear what more Throckmorton was expected to do under the circumstances.

Plea counsel thus made a reasonable investigation into the proposed defense, determined there were no merits to such a defense after consulting his expert, and reasonably concluded that further investigation was not necessary and that it was instead in Petitioner's best interests to pursue a guilty plea. This chain of events does not amount to deficient performance, and is instead indicative of a counsel evaluating and pursuing a reasonable litigation strategy in the face of what he viewed as damning evidence of Petitioner's guilt in the form of the videos Petitioner produced. Plea counsel's performance in relation to the asserted diminished capacity defense was therefore

13

entirely reasonable and Petitioner has failed to show that his performance was constitutionally deficient.  Her claims to that extent are therefore without merit.

Even had she been able to show deficient performance, however, Petitioner cannot show that she was prejudiced either in relation to a plea or at sentencing.  As the Court addressed in discussing Dr. Singer's credibility above, Dr. Singer's testimony was not credible, and his expert opinion was exceptionally weak – he did not clearly and consistently define his terms, he did not discuss the specifics of when and how Petitioner may have lacked the ability to form the requisite *mens rea* for her offenses, and he provided little more than a psychologist's stamp of approval on Petitioner's attempts to defray the blame for her deplorable conduct onto others.  It is thus clear that Dr. Singer's testimony would almost certainly have failed to sway a jury had it been produced or used in any trial, and a reasonable defendant would not have proceeded to trial and face a sentence of up to 90 years based solely on his opinion.

More to the point, even if a jury *had* credited the doctor's opinion, it fails to actually provide a viable defense to the charges had Petitioner wished to proceed to trial.  Under federal law, "expert psychological testimony is not admissible to assert a diminished capacity defense, but only to show insanity as defined by the Act or to negate an element of the crime charged." *United States v. Mister*, 553 F. Supp. 2d 377, 380-81 (D.N.J. 2008) (citing *United States v. Pohlot*, 827 F.2d 889 (3d Cir. 1987), *cert. denied*, 484 U.S. 1011 (1988)).  Thus, while a criminal defendant may present psychological testimony to attempt to make out a lack of the requisite *mens rea* of a criminal charge, he may not assert a defense of excuse or justification based on "diminished responsibility" or "diminished capacity," such as those premised on a defendant being suggestible or having impaired intellectual functioning which fall short of negating the required mental state. *Id.*  While a conviction under § 2251(a) does require that a criminal defendant act purposely to create images or videos that objectively are sexually explicit, the statute does not require that a

14

criminal defendant *intend* to create sexually explicit materials. *See United States v. Heinrich*, 57 F.4th 154, 160-63 (3d Cir. 2023). It is enough that criminal defendant had the intent to make the pictures or videos in question that had the character of being sexually explicit even if the defendant lacked any intent to produce images that specifically were sexually explicit. *Id.*

Here, even under her own theory of the case, Petitioner clearly did have the intent to produce the pictures and videos at issue, which she cannot deny were sexually explicit in character. Petitioner's entire diminished capacity argument is premised on the idea that she was so suggestible that she "reasonably believed" Grennier's story about creating a honey pot for sexual predators[5] and went along with it, creating sexually explicit videos and photos of her children to aid in this goal rather than to merely make money. Inherent in that defense is that she willingly and intentionally recorded the videos and took the pictures and provided them for Grennier. Even if she *did* believe Grennier and produce the sexually explicit pictures and videos without any specific intent to create pornographic imagery, that claim would not defeat the *mens rea* requirement of her statute of conviction. *Id.* Petitioner intentionally took photos and videos of her children that were sexually explicit, regardless of whether her purpose was subjectively other than the creation of child pornography, she clearly had the requisite mental state, and nothing in her arguments or the opinions of Dr. Singer would effectively undercut that fact. Petitioner did not have a viable diminished capacity defense even had Dr. Singer's testimony been credible and

---

[5] The idea that Petitioner "reasonably believed" Grennier's story, even though Petitioner was aware that Grennier had a "price list" for certain sexual acts and was engaging in such acts with other minors strains credulity at best. Although the Court need not and does not reach Petitioner's credibility in this matter as she did not testify, the evidence available in the record certainly seems to better support the conclusion of the expert plea counsel consulted – that this story was a lie – than Petitioner's theory that she blindly accepted Grennier's story and didn't realize she was committing crimes in recording lascivious and explicit conduct by her own children.

helpful, and she was therefore not prejudiced by the failure to further develop such a doomed defense prior to her guilty plea.

Petitioner's claim works no better as a basis for a downward departure or variance at sentencing. During Petitioner's sentencing, one of the many areas of concern noted by Judge Wolfson was Petitioner's inability to accept responsibility for what she had done and her efforts to minimize her own conduct by placing the blame for others. Although Dr. Singer adorned his testimony with the trappings of psychological expertise, his proposed testimony did little more than reinforce Petitioner's denials and attempts to blame everyone but herself for her actions. Indeed, when faced with a less developed version of Petitioner's current argument at sentencing, Judge Wolfson rejected that argument and found no basis for a lesser sentence than that which she imposed. Had this Court sentenced Petitioner and been presented with this argument and Dr. Singer's testimony, this Court would have rejected that testimony as a basis for a downward departure or variance. In light of the extreme severity of Petitioner's crimes, the effect those crimes had on her own children, and Petitioner's lack of acceptance of responsibility for her actions, the sentence imposed appears to have been well supported and warranted under the circumstances. Nothing Petitioner has presented in relation to her alleged diminished capacity would have any likelihood of producing a reduced sentence had it been presented during her sentencing hearing. Petitioner was thus not prejudiced at sentencing for lack of this argument and Dr. Singer's testimony, and Petitioner's diminished capacity defense fails to provide a basis for a finding of prejudice whether presented as a reason for declining to plead guilty or as a basis for a reduced sentence. Petitioner's diminished capacity argument thus provides no basis for habeas relief.

Petitioner next contends that plea counsel proved deficient in failing to further investigate the testimony that could have been provided by Petitioner's daughter and chief victim had she been called as a potential trial witness. Petitioner bases this argument on her daughter's victim impact

16

statement provided as part of her sentencing, which Petitioner believes would have reinforced her alleged diminished capacity and suggestibility.  Petitioner also argues this testimony would have supported her efforts to paint Grennier as the true villain at a potential trial.  As discussed above, Petitioner did not have a viable diminished capacity defense, regardless of whether she called her daughter as a witness in a potential trial.  In reviewing the impact statement in question, Petitioner's daughter presents her mother as her chief caregiver and a beloved family member despite her actions.  While it is understandable that Petitioner's daughter loves her mother and wanted to help her even after she was herself victimized, that impact statement would not have been of any aid to Petitioner.  Much like her mother, the daughter seeks to place the blame on others besides Petitioner and to remove any and all blame she can from her mother.  Petitioner's daughter's statement could not undercut or deny the clear photographic and video evidence that her mother recorded child sexual abuse material of her own daughter.  Given the daughter's bias in favor of her mother, and the clear evidence of Petitioner's guilt in the form of the photographs and videos she took of her own children, it is likely that the daughter's proposed testimony would have backfired.  It is entirely plausible that a jury would have viewed this testimony as the sad aftermath of child abuse and an indication of the lasting trauma and ramifications Petitioner's actions had upon her daughter.  Rather than support Petitioner's case, that testimony likely would have inflamed a jury against her, and certainly would not have undercut the strong evidence of her guilt. No reasonable defendant would have chosen to proceed to trial based on her daughter's purported testimony under these circumstances, and Petitioner therefore cannot establish that she was prejudiced by counsel's failure to pursue potential testimony from her daughter.

In her third claim, Petitioner asserts that counsel proved ineffective in failing to more fully investigate Grennier in support of her diminished capacity defense and to better paint him as the villain of the piece in an effort to obviate Petitioner's guilt.  As this Court has discussed at length,

17

Petitioner did not have a viable diminished capacity defense, and the fact that Grennier engaged in deplorable conduct and "manipulated" Petitioner into joining in on that conduct by filming her children would not have provided a basis for a legitimate defense at trial.  Even if a jury credited the idea the Grennier was the ultimate mastermind and wrongdoer, that fact in no way undercuts Petitioner's involvement in actually creating the photos and videos of her daughter, that Petitioner knew what she was doing, and did in fact intend to take photos and record videos.  That Petitioner intended to take the photographs and videos of her children engaging in activities which objectively were sexually explicit activities is sufficient to meet the *mens rea* requirement of the statute, regardless of whether Petitioner *intended* those images to be examples of child pornography. *Heinrich*, 57 F.4th at 160-63.  Grennier's actions in this matter were unconscionable and the Court in no way desires to minimize or excuse his foul deeds, but by the same token, Petitioner's own deeds were also clearly wrong and more than sufficient to support a guilty verdict had the case been taken to trial.  All the parties involved were already aware that Petitioner blamed Grennier and claimed he had manipulated her before choosing to plead guilty.  And no reasonable defendant would have chosen to proceed to trial based solely on that assertion or blaming Grennier when such a "blame game" would not actually have been a viable defense to the elements of the charges offenses.  Accordingly, Petitioner was not prejudiced by counsel's alleged failure to further investigate Grennier.

In her next claim,[6] Petitioner asserts that plea counsel proved ineffective insomuch as he made a "fair sentencing" "impossible" for Petitioner.  Aside from reiterating the claims addressed above that counsel should have made more efforts to present a diminished capacity defense or done more to paint Grennier as the true perpetrator rather than her, the tenor of this claim is

---

[6] This claim is raised in both grounds four and seven of Petitioner's motion to vacate sentence.

essentially that Petitioner believes it is unfair that Grennier, who cooperated with the Government, received a shorter sentence than Petitioner, and that the only explanation for this disparity must be that Grennier's counsel was competent while Mr. Throckmorton was an apparently deficient "publicly funded attorney."[7]  Putting aside the unjust aspersions being placed at the feet of public defenders, this claim largely repackages Petitioner's argument on direct appeal that her sentence was unjust or shocks the conscience simply because of the disparity between Grennier 's sentence and Petitioner's.

The Court of Appeals, however, aptly described the difference between the two in rejecting that claim – Grennier accepted responsibility for his wrongdoing, while Petitioner repeatedly tried to minimize her conduct and blame others; Grennier cooperated with the Government while Petitioner did not enter into a cooperation agreement; and Petitioner was ultimately the one who gave Grennier access to her children and recorded the videos and photographs which gave rise to her conviction.  (*See* ECF no. 6 at 150-52.)  Petitioner's sentence was entirely fair under the circumstances – her actions were unconscionable regardless of Grennier's own crimes, she refused to accept responsibility for her actions, and continues to minimize her deeds to this day both in person and through Dr. Singer.  Although Petitioner faults Throckmorton for "failing" to prepare her to accept responsibility or enter into a cooperation agreement, he testified at the hearing that he did look into potential cooperation with the Government.  Further, Throckmorton did not represent Petitioner during the sentencing process or during the PSR interview which gave rise to the initial guidelines calculation, including as to acceptance of responsibility.  Petitioner therefore fails to establish that anything Throckmorton could have done would have in any way likely

---

[7] Petitioner does not initially assert that her sentencing counsel was in any way ineffective, nor did she seek to amend her petition to include any claims against her sentencing counsel. As a result, this Court need not and does not address any deficiencies on the part of sentencing counsel.

resulted in a lesser sentence, and has not shown that Throckmorton was so deficient during plea proceedings that it impacted her ultimate sentence. Petitioner thus fails to establish ineffective assistance on this ground.

In a related claim, Petitioner asserts that counsel failed to adequately explain to her the sentencing enhancements under the guidelines which applied to her sentence, and that she thus pled guilty to an offense that subjected to her to a "virtual life sentence" which she would not have accepted if properly advised. Initially, the Court notes that Throckmorton testified at the hearing that he did go over Petitioner's sentencing exposure prior to the plea, and that he advised her that the guilty plea was the best way to limit her exposure to only 30 years rather than the 90 years she would have faced had she insisted on proceeding to trial. In the absence of a viable defense, and in light of the incredibly damning video and photographic evidence of Petitioner's guilt in the record, no reasonable defendant in Petitioner's position would have insisted on going to trial rather than pleading guilty. Indeed, going to trial in this matter would have almost certainly meant trading the 30 year "virtual life sentence" Petitioner received for an "actual" life long sentence in the form of the 90 year sentence applicable to Petitioner following a trial. As described above in relation to diminished capacity and below in relation to public authority, Petitioner had no legitimate defense at trial, and has not presented any basis to support the idea that she would have gone to trial if properly informed. As plea counsel did discuss Petitioner's sentencing exposure with Petitioner, as Petitioner had no viable defense, and as no reasonable defendant would have chosen to go to trial under those circumstances, Petitioner has utterly failed to show that she was prejudiced by Throckmorton's advice related to her sentencing exposure or guidelines calculation. This argument thus serves as no basis for habeas relief.

Petitioner next contends that her conviction must be vacated because she believes that Grennier manipulated the video evidence to remove his part of the proceedings to make it seem as

20

if she had acted alone in recording pornographic videos of her own children.  Petitioner appears to suggest that this both violates Due Process in and of itself and amounts to ineffective assistance of counsel as the issue of this "manipulation" prior to her guilty plea.  Petitioner fails to provide clear evidence that the videos were actually manipulated or altered.  Even assuming that the three videos without sound were manipulated as described, she fails in any way to show how that would have rendered her conduct less onerous or illegal.  Petitioner does not assert that she did not record the videos – which she admitted to doing in her plea – or that the videos contain the sexual material of her daughter that they clearly contain.  Petitioner fails in any way to show how the alleged manipulation affects her guilt other than as another means to minimize her own conduct while placing more blame on Grennier.  Petitioner's act of recording the videos, knowing what she was doing, is more than sufficient to support her guilt, regardless of the alleged manipulations. *Heinrich*, 57 F.4th 160-63.  As Petitioner has not shown that it is likely that a different result would have been produced by raising these alleged manipulations prior to her plea or sentencing, she has not shown that she was prejudiced by counsel's failure to present this argument.  As Petitioner's own deeds still more than support her conviction regardless, she has likewise not shown that the failure to raise her allegations of manipulation in any way denied her Due Process.  This claim thus serves as no basis for habeas relief regardless of whether it is considered as a stand alone Due Process claim or merely another assertion of ineffective assistance of counsel.

In her final ineffective assistance of counsel claim, Petitioner asserts that Throckmorton proved ineffective in failing to pursue a public authority defense on her behalf, resulting in her guilty plea.  A public authority defense, however, is available only where "the [alleged] government agent in fact had the authority to empower the defendant to perform the [illegal] acts in question," and "where the [alleged] government agent had no such power, the defendant may not [assert a] 'public authority' defense." *United States v. Pitt*, 193 F.3d 751, 758 (3d Cir. 1999),

21

*abrogated in part on other grounds*, Honeycutt v. United States, 581 U.S. 443 (2017); *see also United States v. Sariles*, 645 F.3d 315, 318 (5th Cir. 2011); *United States v. Fulcher*, 250 F.3d 244, 254 (4th Cir. 2001).

As Grennier was known to Petitioner to be a retired police officer, he did not have any actual authority to permit Petitioner to engage in illegal behavior.[8] Petitioner cannot base a public authority defense on the apparent authority of the alleged "to catch a predator" scheme that Grennier allegedly told her he was pursuing. Nor could she possibly reasonably rely on such an assertion where Grennier had offered her a price list for having her daughter engage in specific sex acts. The very idea that any lawful entity could authorize the sexual abuse of children is beyond the pale. Put simply, a public authority defense in this matter was a non-starter, and the raising or pursuit of such a defense would not likely have produced a different or better result than what was achieved in this matter. Petitioner thus cannot show that counsel was deficient in failing to further pursue a patently unavailable defense nor that she was prejudiced by that alleged failure. This and all of Petitioner's claims of ineffective assistance of counsel are therefore without merit, and Petitioner's motion to vacate sentence (ECF No. 1) must therefore be denied.

### C. Certificate Of Appealability

Pursuant to 28 U.S.C. § 2253(c), the petitioner in a § 2255 proceeding may not appeal from the final order in that proceeding unless he makes "a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason

---

[8] Indeed, in one of her briefs (ECF No. 20 at 30), Petitioner as much as admits that the defense does not *technically* apply to her facts, and instead relies on the assertion of her diminished capacity to support the idea that it should be extended because of her misunderstanding. As Petitioner has not actually demonstrated that she possesses a truly diminished capacity, and her alleged reliance on Grennier's predator catching scheme was not reasonable in any event, the public authority defense remains inapplicable to her case.

could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Because all of Petitioner's claims are meritless for the reasons expressed above, Petitioner has failed to make a substantial showing of a denial of a constitutional right, and her motion is not adequate to receive encouragement to proceed further. This Court therefore denies Petitioner a certificate of appealability.

## IV.    CONCLUSION

For the reasons set forth above, Petitioner's motion to vacate sentence (ECF No. 1) is **DENIED**, and Petitioner is **DENIED** a certificate of appealability. Petitioner's outstanding motions to seal (ECF Nos. 68, 77-78) are **GRANTED**. An appropriate order follows.

Date: May 18, 2026

s/ Zahid N. Quraishi

**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

23